UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

KIP EDWARDS, et. al.,

Plaintiffs,

VS.

KB HOME, et. al.,

Defendants.

Civil Action No. G-11-CV-240

Houston, Texas
December 1, 2015
2:50 p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GREGG COSTA
HEARING

APPEARANCES:

FOR THE PLAINTIFFS:

Ms. Rhonda Hunter Wills
Mr. Anthony Wills
Ms. Genevieve Estrada
WILLS LAW FIRM
1776 Yorktown
Suite 570
Houston, Texas 77056
713.528.4455
FAX: 713.528.2047
rwills@rwillslawfirm.com

Mr. John M. Padilla
PADILLA & RODRIGUEZ, LLP
5433 Westheimer Road
Suite 825
Houston, Texas 77056
713.574.4600
FAX: 713.574.4601
jpadilla@pandrlaw.com

PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION

APPEARANCES

(continued)

FOR THE DEFENDANTS:

Mr. David Bryce Jordan
Mr. Kevin Stephen Little
LITTLER MENDELSON, PC
1301 McKinney Street
Suite 1900
Houston, Texas 77010
713.652.4784
FAX: 713.951.9212
djordan@littler.com
klittle@littler.com

(by telephone)
Ms. Connie L. Michaels
LITTLER MENDELSON, PC
2049 Century Park E
5th Floor
Los Angeles, California 90067
310.553.0308
cmichaels@littler.com

COURT REPORTER:

GAYLE L. DYE, CSR, RDR, CRR
515 Rusk, Room 8016
Houston, Texas 77002
713.250.5582

PROCEEDINGS

December 1, 2015

THE COURT: All right. The Edwards folks. How are you-all?

02:49:26 MS. WILLS: Good afternoon, your Honor.

MR. JORDAN: Good afternoon, Judge.

THE COURT: All right. If you want to state your appearances. Ms. Wills.

MS. WILLS: Rhonda Wills, along with my co-counsel 02:49:52 John Padilla, Anthony Wills, and Genevieve Estrada on behalf of the Plaintiffs.

MR. JORDAN: David Jordan and Kevin Little on behalf of the Defendants. I believe we have a telephone appearance, as well.

02:49:59 THE COURT: Anyone on the phone?

MS. MICHAELS: Yes, your Honor. This is Connie Michaels of Littler Mendelson. I am counsel of record for the Bejenaru matter which is related to this one and pending in Los Angeles.

02:50:18 THE COURT: All right. Do you want to seal this since the whole settlement is under seal? Do you want to seal this hearing?

MS. WILLS: Actually, your Honor, for reasons that we're going to explain, it would be, in our estimation, 02:50:31 inappropriate to seal it. If I could just sort of give the

Court sort of an overview of what's going on.

THE COURT: Sure. I'm always against sealing. So, if the parties don't want it -- you don't have to convince me if the parties don't want it. But go ahead.

02:50:45 MS. WILLS: Your Honor, as you know, there's the Edwards lawsuit; and as Ms. Michaels mentioned, there's a Los Angeles Superior Court case that's pending called Bejenaru.

THE COURT: Right.

MS. WILLS: Edwards, of course, is FLSA claims only.

02:50:56 And in Edwards we have 396 Plaintiffs and opt-in Plaintiffs that remain. Of those 396, 75 of them are from California.

THE COURT: So are part of both cases?

MS. WILLS: Those 75 people are a part of both cases.

THE COURT: In the California case, are there federal

02:51:18 claims raised or just the state claims?

MS. WILLS: The California case is California wage and hour state claims only, your Honor; and in that case, in addition to the 75 that are also a part of your Edwards case, there are 166 other absent class members.

02:51:36 We had a telephone hearing yesterday with Judge Johnson who is presiding over the Bejenaru California case; and based on the joint recommendation of the parties, as well as the suggestion of the mediator, we proposed to Judge Johnson and she agreed that because this Edwards case sort of, I guess, envelops

02:51:56 that case that it would be appropriate to, basically, have the

settlement only be before this Court.

So, she has now stayed the Bejenaru case with the anticipation being that we're going to amend the complaint, bring those state --

02:52:12 THE COURT: Bring the state claims?

MS. WILLS: -- and bring those claims before your Honor. This Court would then handle the entire settlement which means that this settlement will be a hybrid settlement, an FLSA and a Rule 23 class action settlement.

02:52:25 THE COURT: Which then changes the approval requirement process.

MS. WILLS: Which changes everything, your Honor.

And so, then, your Honor would maintain jurisdiction over the case with respect to approving the entire 02:52:35 settlement as well as maintain jurisdiction over enforcing the settlement. And once she knows that you have done a final approval of the settlement, the Bejenaru case will be dismissed.

THE COURT: So, when you said there's 75 people here who are also in California, how many people total are in the 02:52:52 California case?

MS. WILLS: 241. And I will say, your Honor, that is our best estimate. We are still working through those numbers. But 241 -- it might give or take one or two people. It's about 241, your Honor.

02:53:05 THE COURT: Who are in the entire class?

02:53:13

02:53:24

02:53:42

02:53:55

02:54:01

MS. WILLS: Correct.

MR. JORDAN: The California people.

MS. WILLS: The California people. Yes, that's what you're asking about.

THE COURT: But in other words, that's an opt-out case. So, you say 271. It's not the actual -- that's the universe of people that are going to be affected unless someone opts out.

MS. WILLS: Correct. So, there are sort of two camps in that group, your Honor. So, it's a total of 241. 75 are already before this Court having opted in to Edwards. So, we believe, your Honor, based on Fifth Circuit precedent and rulings, frankly, from your Honor that for those 75 people who opted in to Edwards, your Honor has the right to settle all their claims, be they federal or state claims.

So, those 75 people will have their state claims determined by the Court as to whether or not the settlement is fair to those people. So, that leaves 166 who did not opt in and they are --

THE COURT: But are a part of the class.

MS. WILLS: And they're all absent class members, your Honor.

THE COURT: Right.

MS. WILLS: None of them are named class members in the case. They're all absent class members. And those 166 will

02:54:17

02:54:27

02:54:35

02:54:50

02:55:05

receive notice and an opportunity to opt out. They'll have to send in a claim form in order to get their settlement proceeds.

THE COURT: Just thinking practically, most of those people would have received a notice in this case and they chose not -- I mean, they're probably not very active people because they chose not to opt in here. Wouldn't they have received something in this case?

MS. WILLS: Some of them would have; but because of the statute of limitations, I think there might maybe about a --

THE COURT: The time period.

MS. WILLS: -- six-to-eight month period where some people --

MR. JORDAN: There's a later group that wouldn't --

THE COURT: But most of them probably got notice in this case. So, now, they'll get one in that case saying it's not an opt-in situation, you're going to be affected by this settlement unless you say something about it.

MS. WILLS: That's correct, your Honor.

And so, if your Honor agrees with that, what we propose is there is a $7.5 million settlement. That comes to a per claimant gross amount of $13,345 and that's gross.

THE COURT: When you say "per claimant," including the whole universe?

MS. WILLS: Everyone. That's a total of --

THE COURT: Including the ones that are to be brought

into this?

MS. WILLS: And that's an estimated 562 total claimants. That's Edwards claimants, as well as California absent people that aren't in Edwards. So --

02:55:14 THE COURT: If you do the multiplier, the California people are getting -- I don't have it right in front of me right now.

MS. WILLS: I do. I have an actual copy if your Honor would like it.

02:55:21 THE COURT: Yeah.

All right.

The absent class members are getting less than the opt-ins. But they don't have federal claims for one thing, they just have state claims.

02:55:39 MS. WILLS: They don't. And that case was never certified, your Honor, so that also --

THE COURT: The uncertainty of certification.

MS. WILLS: The uncertainty of certification.

THE COURT: When was that case filed?

02:55:47 MS. WILLS: Two years -- September 12th of 2013, your Honor.

THE COURT: What's the basis for distinguishing the -- I think I probably know. But the Houston and California get 1.25. The other settling plaintiffs get -- Edwards opt-ins gets

02:56:09 just a one multiplier?

02:56:16 02:56:26 02:56:40 02:56:54 02:57:06

MS. WILLS: Well, the Houston settling plaintiffs, as your Honor knows, they've been actively involved in the litigation. In fact, some of them have had their claims dismissed for not being actively involved.

THE COURT: Right.

MS. WILLS: I mean, they've all had to turn in documents. They've had to provide testimony through declarations. They've had to provide tax returns. They've been actively involved. And so, that gave them a higher multiplier because they have taken greater risks. They've been more involved in the litigation, and they've taken an active role.

The California settling plaintiffs have both state claims and their federal claims. So, they have two claims.

And then, with respect to all others, they have the 1.0 multiplier.

THE COURT: How many others are there?

MS. WILLS: Total other Edwards people, your Honor, there are -- 63 of them are from Houston and 258 are from other places. So, we have 75 from California, 63 from Houston, and 258 from other places.

THE COURT: Which are -- I'm just curious, other non-Houston parts of Texas or --

MS. WILLS: Non-Houston, other parts of Texas --

MR. JORDAN: 26 other --

MS. WILLS: -- from other states.

THE COURT: I mean, another basis for giving them a little less -- as allocated but giving them that lesser amount is there's -- you know, there's potentially an argument, I think 02:57:20 which I talked about, we were going to try the Houston people first but whether there would be venue issues with some of the non-local people. So, I think that's -- there's reasons to allocate it the way you have.

All right. Well, then, what -- how long is the 02:57:38 process of -- as we know, the FLSA we could wrap that up tomorrow or today. The issue is going to be the notice procedures for the Rule 23.

MS. WILLS: There are, your Honor. So, this is a proposed schedule that we -- we had a conference call yesterday 02:57:54 with opposing counsel. We discussed two weeks of getting the following filed: amending the pleadings to add the California claims. We are also going to propose to the Court that we have one named Plaintiff who will be a representative on behalf of the Bejenaru folks, and that will be Andrea Bejenaru. And then, 02:58:15 have one person as a representative for the FLSA, and that will be Kip Edwards.

So, it will be -- and the amended complaint, it will be Bejenaru and Edwards as the representative Plaintiffs.

THE COURT: All right.

02:58:26 MS. WILLS: They both attended the mediation. They've

both been actively involved in the settlement process.

The parties are also going to enter into a stipulation, that is, for any reason the settlement falls apart, we will maintain the status quo and go back to California to litigate those claims and then continue to litigate the FLSA claims before this Court.

02:58:39

The next piece that will be filed in two weeks, your Honor, will be our joint motion for preliminary approval. It will include the approval for the FLSA settlement, as well as the claims for the 75 California people to settle both their FLSA claims and their state law claims.

02:58:55

We will also include the settlement agreement. And then, we are also going to include a notice form and a claim form to be mailed out to the Rule 23 absent class members. And there are 166 people approximately who will receive that -- those claim forms.

02:59:13

We will also submit to the Court a proposed order, basically, asking that Ms. Bejenaru and Mr. Edwards be appointed as class representatives, that we be appointed as class counsel. We're going to ask the Court to appoint a claims administrator. We are now seeking bids from two claims administrators, and we're going to go with the more affordable claims administrator to administer the claims.

02:59:30

We are also going to ask the Court to certify the claims for settlement purposes, so recertify the FLSA and then

02:59:44

 certify the Rule 23.

The parties have agreed on a notice and opt-out period for the absent class members of 45 days. And then, we would ask that once that 45 days has expired that the Court promptly set a final fairness hearing.

03:00:01

There are a couple of other issues, though, your Honor, with the settlement that I wanted to bring to the Court's attention.

THE COURT: Sure. I mean, so far everything you said sounds -- sounds acceptable.

03:00:11

MS. WILLS: We just want to sort of talk everything through with the Court so, if there are issues when we file our papers, we can adjust or address whatever the Court might have concerns about.

03:00:19

So, the case expenses in the case, your Honor, are roughly about $250,000. We're coming up with a hard number right now. We've sent out letters asking all vendors.

THE COURT: In both cases?

MS. WILLS: In both cases. And we still have bills coming in. But $250,000 is a rough estimate.

03:00:32

THE COURT: All right.

MS. WILLS: We are going to request service awards, two different types of service awards. One will be for Kip Edwards, Michelle Brailey, and Andrea Bejenaru. Michelle Brailey also attended the mediation and has been very involved,

03:00:46

but she's due to deliver a baby any day now. So, that's kind of going to take her out of continuing.

THE COURT: Was she once -- she's in the Houston class?

03:01:01 MS. WILLS: She's in the Houston class. She came to the mediation, came to San Francisco for two or three days for mediation and has been very involved. For those three folks, we're going to ask for $15,000 for each of them.

And for the other named plaintiffs, we're going

03:01:15 to ask for $10,000 for each of them.

THE COURT: There were three others?

MS. WILLS: There are a lot of them in Bejenaru. Correct me if I'm wrong.

MR. JORDAN: I won't be able to correct you.

03:01:27 MS. WILLS: Connie, are there 12 named Plaintiffs in Bejenaru?

MS. MICHAELS: I believe there's 11.

MS. WILLS: Okay. So, there are ten. Ten in the California case, and they've all been deposed. And some of them

03:01:36 have had to travel to give their depositions.

THE COURT: That was my question. What have they done other than being named? But they all have been deposed?

MS. WILLS: And they've provided documents, information. They've been deposed. They've actively

03:01:48 participated. And then here in Texas, I believe there are --

MS. ESTRADA: 15.

MS. WILLS: 15. And I -- if I'm not mistaken, your Honor, there may be one of them who was not deposed. But we're trying to verify that. But she's been involved. The Defendants, for some reason, I think, just didn't take her deposition.

MR. JORDAN: Who was that?

MS. ESTRADA: Courtney.

MS. WILLS: Courtney.

MR. PADILLA: And there was one California person that was about to be deposed when the case settled. I think he had traveled to California.

MS. WILLS: He literally had shown up for his deposition; and we said, "We're going to save the court reporting fees. Go back home. Get back on the plane." But he had prepared. And so, they -- those are the amounts that we will be seeking, if the Court feels comfortable with that, for those folks who have really driven this litigation. I mean, it's gone on four and half years, and these people have been very involved.

The third-party administrator, as we mentioned, we're going to get two bids.

THE COURT: How many people -- I don't know if you have this answer on your fingertips. Are there people who haven't -- who aren't named plaintiffs who have been deposed?

            MS. WILLS: No, your Honor.

THE COURT: Okay.

MS. WILLS: Not on the plaintiffs' side.

THE COURT: Right.

03:02:49 MR. JORDAN: Is that correct? We selected non-named plaintiffs I thought that had been -- all of them were named? Okay.

MS. WILLS: They were all named plaintiffs. You're thinking about Williams.

03:03:01 MR. JORDAN: No. I thought we identified -- I thought the original agreement was we were going to take all the named plaintiffs plus -- plus two non-named from every jurisdiction. So, I thought there were at least non-named.

THE COURT: I had recalled at least some discussion about that early on but --

03:03:13

MR. PADILLA: Did that stop when the decision was made to try the Houston case first?

MS. WILLS: I think it did.

MR. JORDAN: But I thought we took the two non-named in Houston.

03:03:23

THE COURT: You guys can look it up later. I guess my only point is to me that -- somebody being named or unnamed doesn't really involve a lot of investment of time on their part. Being deposed, producing documents, attending meetings, mediations, that I understand.

03:03:29

So, I would think, if there are people who aren't named but who did invest a lot of time, then maybe they should be considered, too. But it might not be as easy a line to draw just saying named plaintiff. So, just a thought.

03:03:46 MS. WILLS: Yes, your Honor.

THE COURT: It's not an issue if Ms. Wills is right about who has been deposed.

MS. WILLS: We'll verify it.

MR. JORDAN: We don't have an objection either way, so 03:03:56 we'll --

MS. WILLS: Thank you, your Honor.

With respect to the third-party administrator, once we got the bids, your Honor, we'll be able to -- what we, typically, do is say, you know, "Look, we got to put an amount 03:04:08 in here. You need to tell us the max that you're going to bill us." And so, typically, we negotiate a fee; and that fee will cover all of the mail-out costs, the costs to send out all of the checks to all of the claimants, to handle all of the taxes.

There are often state tax implications. They 03:04:25 handle the W-2s, the 1099s. And then, also, basically, to handle everything in processing, the notice, the claim forms, as well as the checks. And then, we're going to request also, your Honor, that to the extent that there are unclaimed checks or uncashed checks that after six months that money be paid into 03:04:44 the State of Texas unclaimed property fund.

With respect to attorney's fees, your Honor, we are still working on our lodestar. After four and half years of litigation in two cases across various states, our attorney's fees are -- our lodestar is, we believe, very -- very large.

03:05:05 THE COURT: What case has involved more work, this one -- this has been pending a lot longer. This one or the California one?

MS. WILLS: I would say this one, certainly, your Honor. I mean, there are -- it's been --

03:05:16 THE COURT: Right. No. I'm asking because I'm familiar with the case. I want to get a sense of --

MS. WILLS: In the other case, you know, there have probably been over ten -- you know, ten, twelve depositions, lots of documents produced in that case. And frankly, there's 03:05:27 been a lot of overlap.

THE COURT: Right.

MS. WILLS: So, it's kind of hard to distinguish between the two. But we anticipate seeking an attorney fee of 40 percent. But certainly, we will submit to the Court our 03:05:37 lodestar and the other information to support the fee that we're seeking.

There is another issue that's come up, your Honor, with something called a PAGA claim. I can -- I've conferred with our mediator on this because we were kind of 03:05:53 having a disagreement. Just so your Honor knows, in the State

of California, there's something called a PAGA claim.

And Connie, you can chime in if you'd like.

But basically, KB Home wants to have PAGA claims released as a part of the settlement. In speaking with our mediator, he believes that that's reasonable. And we have an excellent mediator, Mark Rudy. He's in California. He handles these mediations all the time.

So, we will agree to amend the complaint to include the PAGA claims. Mr. Rudy tells me that it's standard. We need to send a letter, basically, to the State of California telling them that we're doing this. But he says we can amend the complaint and go ahead and send the letter now because there is a 33-day notice period; but the settlement won't be finally approved until well after that 33 days has expired.

03:06:11 03:06:27

THE COURT: When you say -- is that like their Work Force Commission or --

03:06:42

MS. WILLS: Connie, do you want to explain to the Court a bit more about the PAGA claim?

THE COURT: How does this work? Yeah.

MR. JORDAN: By the way, can I -- let me just -- this is David Jordan. Let me just make one comment. There are two or three outstanding terms that we're still negotiating with the mediator. I don't know that -- I can appreciate this PAGA discussion. But I don't know if this is the appropriate forum to discuss maybe many other outstanding issues that we have.

03:06:51 03:07:05

They're not significantly material, but I don't --

THE COURT: Is that P-A -- spell it for me.

MR. JORDAN: Private Attorney General Action.

MS. WILLS: I'm sorry, your Honor. Private Attorney General Action.

03:07:15

The reason why I bring it up to the Court is the mediator has recommended that we set aside $25,000 to be paid to the Attorney General's Office for this PAGA claim. And obviously, that would have to be something that the Court feels comfortable with, which is why I bring it up at this juncture when we're talking about how the settlement funds are going to be divvied up.

03:07:29

That is not on the settlement allocation sort of, I guess, outline that we sent to the Court earlier. But that's why I bring that up at this juncture, your Honor, because it's, obviously, something that the Court has to evaluate.

03:07:44

THE COURT: All right.

MS. WILLS: I'm sorry, Connie, if you want --

THE COURT: Did you want to say -- I mean, did you want to explain that more or -- Mr. Jordan was saying that we should wait to see if that is even going to be issue.

03:08:00

MR. JORDAN: I'm just suggesting as it relates to anything else you might want to raise about sort of ongoing negotiations, I think we should reserve that until maybe we've agreed to these issues. But I'm okay with discussing the PAGA

03:08:15

 issue.

THE COURT: Can you explain these Private Attorney General Actions, how they normally get resolved in a class settlement.

03:08:24 MS. MICHAELS: Certainly, your Honor. Again, this is Connie Michaels. It is pretty typical in California class action matters that if a PAGA claim, the Private Attorney General Act Claim, in California is not originally part of the complaint that for settlement purposes the complaint gets added. 03:08:49 The letter gets sent to the Labor Workforce Development Agency, and as pro forma it just indicates that it's not going to take any action and that an amount along the lines of what the mediator recommended is, in fact, paid to the state in order to exhaust those particular claims.

03:09:09 So, the procedure that Ms. Wills outlined that she, you know, is apparently comfortable with is, in fact, typical of what we do out here to resolve those additional claims. They're largely tag-a-long claims so that they derive from the same State Labor Code, and it's just an effort to try 03:09:27 to wrap up all of the claims at once.

THE COURT: So, it's, basically, people have an individual claim under California state law but they also have the right to bring a claim in the name of the state? Is that --

MS. MICHAELS: Yes.

03:09:38 THE COURT: So, your concern is, if that's not

included, these people who are part of this class settlement, could turn around and go sue not in their own name but in the name of the Attorney General? Is that, basically, the --

MS. MICHAELS: That's, basically, it, your Honor; though, frankly, my concern is less with Ms. Wills' clients and more with certain plaintiffs' firms out here that do tend to look for what cases have settled and then themselves initiate these PAGA actions as sort of a pick up, if you will, to try to get anything that's remaining.

03:09:54

And so, we do want to resolve that. The case here is settling for a significant amount. I mean, I want to make sure that all of the claims are covered.

03:10:14

THE COURT: No, sure. I'm trying to figure out how this would work. But those plaintiffs' firms would have to find -- I mean, they still have to find a plaintiff or just -- you can just file it under the name of the state, it doesn't even have to be -- you don't have to have an actual plaintiff?

03:10:27

MS. MICHAELS: They have to find one plaintiff.

THE COURT: Okay, right. Yeah. Okay. I'll have to -- one of my best friends is a federal judge in San Francisco. Now, I have something to ask him about.

03:10:40

MS. MICHAELS: Oh. Well, if he has any experience with this, I'm sure you'll get an earful. It's really the bane of the Court's existence out here because PAGA actions don't have to follow any typical class action procedures and our

03:10:55

judges out here are really trying to figure out the best way to handle them. So, they're really getting a lot of focus on litigation out here over the last year.

THE COURT: All right. Well, thank you for explaining that.

03:11:08

MS. MICHAELS: Thank you for giving me the opportunity.

MS. WILLS: So, we would propose, your Honor, based on the allocation, that this would be a line item up there where the third-party administration fee would go, as well.

03:11:17

Also, your Honor, we have discussed the possibility of having a reserve fund or hold-back. And that would be just in case something goes wrong with calculation or someone gets the wrong amount or someone is inadvertently left out, that we don't wind up having disbursed all the money and there's no money left for that person.

03:11:38

We were -- I was thinking -- we've kind of been talking about a reserve fund of something in the range of 25,000 to 50,000, something like that; and then, at the end of a set time period, probably six months, when the -- all the other money would be paid into the state anyway, it would be disbursed equally to everyone so everybody would get another check for 30, $40 or whatever it would be.

03:11:55

THE COURT: I don't have a problem with that. And the reserve fund is not going to be as much an issue here as it

03:12:10

 normally is because, if I'm understanding this right -- I mean, often in the class actions, you don't know who -- you know, where they have to, like, submit something to actually claim a check. I mean, here, everyone is getting paid in that California case, right?

03:12:24

MS. WILLS: Except for the 166 people. They have to send in a claim form.

THE COURT: They do. Okay. So, what's going to happen when -- I assume the claims administrator says, "Here's the percentage that usually submits something," right? You have a good sense but --

03:12:33

MR. JORDAN: Uh-huh.

THE COURT: -- it can come in above or below that. What's -- is that the funds you're saying would revert to the state -- this Texas fund?

03:12:44

MS. WILLS: No, sir. That's slightly different. Basically, once we know how many claimants there are, then there would be a recalculation.

THE COURT: I see.

03:12:51

MS. WILLS: But this would be for --

THE COURT: I see.

MS. WILLS: Say we completely miss somebody --

THE COURT: No, I get it. No I understand.

MS. WILLS: -- it would be more for that.

03:12:57

THE COURT: Someone hears about it and says why wasn't

I in this and their name wasn't on the list.

MR. JORDAN: Or we do the math wrong. We thought there were 20 weeks and there were 120.

THE COURT: I see. But the money won't be distributed until we know who's claimed -- who's submitted something?

03:13:05

MS. WILLS: Which will happen after the 45 days have expired and then your Honor --

THE COURT: So, you don't even have to estimate the number. I got it.

03:13:13

MS. WILLS: Yeah.

MR. JORDAN: And then, there will openly be a subsequent distribution of the reserve later.

THE COURT: Right, right.

MS. WILLS: Yeah.

03:13:18

THE COURT: No. That all sounds fine.

MS. WILLS: Let's see. And then, your Honor, we also intend that one-half of the money to each claimant be unpaid wages and then one-half be allocated to liquidated damages and/or penalties for the California claims.

03:13:35

And we have also made a minimum payment of $500 to each claimant. So, even folks that have a really small claim will get at least $500.

THE COURT: That sounds fine. On the first point you just mentioned, just for the California plaintiffs is it going to be allocated that way, half wages, half liquidated damages?

03:13:52

MS. WILLS: Yes, your Honor.

THE COURT: Everyone else is just all wages?

MS. WILLS: Everybody. Everyone, it will be half and half.

03:14:01 THE COURT: Everyone.

MS. WILLS: But with the California people, instead of liquidated damages, it will also be penalties because under California law they're entitled to that.

THE COURT: Okay. Now, I understand. Okay.

03:14:10 MS. WILLS: And so, your Honor started out asking about sealing the record; and as your Honor -- now that -- that's why I wanted to explain that it's a Rule 23; and accordingly, it has to be an open and public proceeding.

THE COURT: Right, right. I'm thinking about that 03:14:24 last point I asked for a clarification on. I mean, it does seem to me the wages would be higher than 50 percent, at least for the FLSA case that -- that I'm familiar with. I mean, the California -- it was --

MS. WILLS: Well, since it's double damages, 03:14:42 typically --

THE COURT: For liquidated?

MS. WILLS: -- the liquidated damages are equal to whatever the wages are. That's why we always just usually do half and half because it's double damages, so liquidated damages 03:14:50 are going to be whatever the wages are. So, that's why we

 usually split it down the middle since it's -- liquidated damages are considered double damages.

THE COURT: Right. Looking through here, they were really asserting strongly a good faith defense. I know you vigorously disagreed with that.

03:15:02

MR. JORDAN: You know, your Honor, in these kinds of cases, typically, you look back to the complaint to source out the breakdown of the damages and the taxability of each feature. And there's a lot of allegations I think that support both a low wage number and a double damages for the liquidated portion.

03:15:19

I don't -- and it's pretty typical in these cases that we would settle at a 50/50 range. So, I don't forecast that that would be problematic, at least from our perspective so --

THE COURT: Okay.

03:15:33

MS. WILLS: Your Honor, in terms of a schedule, we would -- we've agreed that two weeks, we can get the preliminary settlement papers filed with the Court, which would be December 15th. We would ask that the Court set a hearing thereafter so that we can, obviously, address any concerns that the Court might have once the preliminary approval papers are filed. And then, if the Court approves everything, we can then know the dates to put in to get notice out to those 166 persons in California.

03:15:47

THE COURT: How soon after the filing are you

03:16:03

available? I mean, it shouldn't take me long, especially with this discussion, to review it all.

MR. JORDAN: I'm --

THE COURT: Did you want to do it, you know, this month or just put it --

MS. WILLS: We would like to do it this month, your Honor.

THE COURT: We can do it this month then. What about --

What day did you say you're going to file it, two weeks from now?

MS. WILLS: The 15th, your Honor.

THE COURT: What about the 21st? Well, what about the 22nd? As you just heard, I have this trial starting the 16th. It is a bench trial. I mean, how long -- how long do you think the hearing will take?

MS. WILLS: It depends on how many questions your Honor has.

MR. JORDAN: Sounds like it will be short, your Honor.

THE COURT: Shorter than this probably, right, because it's all being explained today?

Do you think we can do it by phone even?

MS. WILLS: Well, it might be helpful if you have something you want to point out to us in the papers so we can fix it right then and there.

          THE COURT: She likes coming to the courthouse. Mr. Jordan not so much.

MS. WILLS: I'm happy to do whatever your Honor wants.

THE COURT: I like the courthouse. I come here every day.

03:17:06

MS. WILLS: We can do it by phone if that works better for the Court's schedule.

MR. JORDAN: And we're available on the 22nd.

MS. WILLS: We're available as well, your Honor.

03:17:15

MR. JORDAN: I prefer that week.

THE COURT: Let's just do it then, on the 22nd.

10:00 o'clock, does that work?

MR. JORDAN: That's fine, your Honor.

MS. WILLS: That's fine with us, your Honor.

03:17:23

THE COURT: I'll do it here. Anyone is welcome to call in, though. I mean, it's -- we'll do it in the same place, assuming Judge Bennett doesn't have a trial the week of Christmas, which I doubt.

MS. WILLS: And I guess then at that time, your Honor, we can decide on a fairness hearing date or does your Honor -- I don't know how busy -- looks like we're going to be falling into sometime in February.

03:17:40

THE COURT: I was going to say what time frame. February is pretty good. The middle of February is pretty good. We should be able to make that work.

03:17:52

03:18:05

03:18:11

MR. JORDAN: We just need enough time for the claims administrator to generate the notices and get them out the door. So, we'll have to -- we'll collaborate with them.

THE COURT: You'll probably have a better idea in a couple of weeks. Do you want to just set it then?

MR. JORDAN: Yeah.

THE COURT: We'll just set it -- at the December 22nd hearing, we'll set the other hearings.

MR. JORDAN: I think that's right.

MR. PADILLA: Are we off the record, Judge?

THE COURT: Yes.

(Proceedings concluded at 3:18 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, to the best of my ability.

By: /s/**Gayle L. Dye** **01-15-2016**

Gayle L. Dye, CSR, RDR, CRR Date